NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0343n.06

Nos. 22-5046/5107/5131/5681/6056

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 02, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| ALIM TURNER, RONALD TURNER, KEDARIS GILMORE, USHERY STEWART, and DEMETRIUS BIBBS, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

Before: SUTTON, Chief Judge; GRIFFIN and READLER, Circuit Judges.

GRIFFIN, Circuit Judge.

In these consolidated cases, defendants appeal their convictions and sentences stemming from their distribution of massive amounts of drugs in Tennessee as part of their membership in or association with the Vice Lords gang. Defendants raise a host of issues on appeal. This opinion resolves the appeals of defendants Alim Turner, Ronald Turner, Kedaris Gilmore, Ushery Stewart, and Demetrius Bibbs. We separately address defendant Mahlon Prater's appeal in No. 22-5599. In this case, the issues raised by defendants lack merit. Thus, for the reasons stated below, we affirm.

I.

These appeals concern a subset of the Vice Lords gang, sometimes known as the Unknown Ghost Vice Lords, which operated in Tennessee in 2018 and 2019. The Vice Lords gang is a hierarchical organization that sells significant quantities of drugs and often uses firearms and other

violent means to facilitate that distribution. Although gang members peddled various kinds of drugs, methamphetamine was their main product. For example, one of the gang's main players, Christopher Hounschell, regularly sourced 15 to 20 pounds (7 to 9 kilograms) of methamphetamine per month for members to distribute in and around Knoxville, Tennessee.

Brothers Alim and Ronald Turner led the gang's efforts. Ronald was in charge, facilitating the gang's acquisition and distribution of drugs and money laundering (all from his Tennessee prison cell while serving a sentence for attempted second-degree murder). Alim similarly played a major role; at his brother's direction, Alim helped secure pounds of drugs from various sources—including a fateful shipment of five pounds of actual methamphetamine to Mahlon Prater's Knoxville house that law enforcement intercepted in July 2019. Like Prater, defendants Kedaris Gilmore and Ushery Stewart were mid-level dealers who helped acquire and sell large amounts of methamphetamine and other drugs. Demetrius Bibbs, a member of the Bloods gang who associated with the Vice Lords, played a smaller role, focusing on heroin. Firearms and violent crimes pervaded the gang's activities.

The operative indictment charged numerous defendants with conspiracy to distribute and possession with intent to distribute various scheduled drugs (with methamphetamine being the focus), conspiracy to launder money, and other drug- and firearm-related crimes. Some defendants pleaded guilty, while eight others elected to be tried by a jury. Those who pleaded guilty testified against those who did not. Following a lengthy trial, the jury convicted all eight defendants of most of the crimes charged. Six appeal.[1]

---

[1]Two defendants who were convicted by the jury, Jyshon Forbes and Trevor Cox, did not appeal.

As relevant here, the main conviction was for drug-trafficking conspiracy. Apart from Bibbs, the jury found that 50 grams or more of methamphetamine was attributable to each defendant (Bibbs was not charged with methamphetamine crimes; instead, the jury attributed heroin to him). Other convictions include illegal firearm use and possession, money-laundering conspiracy, drug possession, and possession with the intent to distribute.

The combination of their conspiracy convictions, the various enhancements, and the district court's drug-quantity calculations—that each defendant (save Bibbs) was responsible for at least 4.5 kilograms of actual methamphetamine—produced a Guidelines range of life imprisonment for all but Bibbs. To put the drug-quantity finding in context, it is in the same Guidelines category as 90 kilograms or more of heroin, 450 kilograms or more of cocaine, and 36 kilograms or more of fentanyl. U.S.S.G. § 2D1.1(c)(1). "An average 'dose' of methamphetamine weighs between one-tenth and one-quarter of a gram." *United States v. Potter*, 927 F.3d 446, 448 (6th Cir. 2019). Using that formula, defendants (again, save Bibbs) were responsible for between 18,000 to 45,000 individual doses of methamphetamine.

The district court imposed life sentences for Alim and Ronald Turner, Gilmore, and Stewart (and all but Ronald also received additional mandatory consecutive sentences for their firearms convictions under 18 U.S.C. § 924(c)), and 120 months' imprisonment for Bibbs (33 months above his Guidelines range). When defendants were sentenced, Bibbs (age 29) was the oldest, and the rest were between 22 and 25 years old.

## II.

We first address the district court's denial of two motions to suppress, beginning with defendants' challenges to wiretaps on the telephones of Mahlon Prater and Alim Turner. Evidence discovered through the wiretaps, along with the testimony of several coconspirators who pleaded

guilty and then cooperated, formed the basis for defendants' convictions. We also address Stewart's challenge to a search warrant that authorized a search of his residence. For the reasons that follow, none of these pretrial issues are meritorious.

A.

Law enforcement began investigating the Knoxville, Tennessee, chapter of the Vice Lords street gang for drug trafficking in mid-2018 following a rise in violence—namely retaliatory shootings—between the Vice Lords and the Crips. As part of those efforts, officers sought and received three wiretap orders: (1) a March 26, 2019, order tapping Mahlon Prater's telephone ("TT-1"); (2) a June 5, 2019, order tapping Alim Turner's telephone ("TT-2"); and (3) a July 26, 2019, order extending the tap of Alim's "TT-2" telephone and tapping another telephone number associated with him ("TT-2/TT-3").

Alim Turner, Ronald Turner, and Stewart contend that the affidavits in support of the wiretap applications did not establish probable cause or necessity as required by the Wiretap Act. Alim separately asserts the government did not comply with the Act's sealing requirements. A magistrate judge rejected defendants' arguments in a report and recommendation, which the district court largely adopted. As set forth below, both judges correctly identified the significant flaws in defendants' arguments.

1.

We begin with a brief overview of the law applicable to reviewing wiretap orders. Congress granted statutory authority for law-enforcement interception of private telephone conversations when it passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–23. The statute permits a federal judge to issue a wiretap order if the government establishes: (1) probable cause to believe that the targeted individual engaged or will

engage in criminal activity; (2) that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"; and (3) the wiretap application includes "a full and complete statement" in that regard. *Id.* §§ 2518(3)(a), (c), (1)(c).

A wiretap authorization requires a judicial determination that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" an enumerated offense and that "particular communications concerning that offense" will be intercepted. *Id.* § 2518(3)(a)–(b). When reviewing Title III intercept orders for probable cause, we apply a similar standard to that used to evaluate search warrants. *See United States v. Alfano*, 838 F.2d 158, 161–62 (6th Cir. 1988). "Certainty is not required, but rather a fair probability and something more than mere suspicion." *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011). We evaluate the affidavit "on the totality of the circumstances and in a reasonable and common sense manner," and give "great deference" to the issuing judge's determination that probable cause existed to issue the intercept order because that judge was "in the best position to determine all of the circumstances in the light in which they may appear at the time." *Alfano*, 838 F.2d at 161–62 (citations omitted). Finally, when—as here—a district court denies a defendant's motion to suppress the fruits of the Title III surveillance, "we review all evidence in the light most favorable to the government." *United States v. Young*, 847 F.3d 328, 342 (6th Cir. 2017).

Regarding necessity, federal law enforcement officials must make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This necessity requirement "[e]nsure[s] that wiretapping is not resorted to in a situation where traditional investigative techniques would suffice to expose the crime." *Young*,

847 F.3d at 343 (internal quotation marks omitted). "What is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation." *Id.* (brackets and citation omitted). In other words, the government "is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted"; rather, the government must have given "serious consideration" to traditional investigative techniques and then explain their inadequacies. *Alfano*, 838 F.2d at 163 (citations omitted). We review the factual finding of necessity for clear error. *See United States v. Cooper*, 893 F.3d 840, 844 (6th Cir. 2018).

2.

Agent Brandon Stryker's March 26, 2019, affidavit set forth probable cause and necessity for an intercept of Prater's phone (TT-1).

a.

Agent Stryker's 32-page affidavit is full of facts that would lead a reasonable judge to determine that there was probable cause to believe that defendants were involved in a drug-trafficking conspiracy. It first identifies Alim Turner as the one "in charge of the gang in the Knoxville, TN area" and "also sells drugs." The affidavit, for example, details how police searched and seized Alim's phone pursuant to a search warrant after his arrest for violating the terms of his probation. Their search "discovered many drug trafficking related conversations" on his phone, including one on November 16, 2018, wherein Alim "discussed buying more drugs, marijuana and possible cocaine or crack cocaine." And it identified Prater as a ranking Vice Lords member who sold crack cocaine to a confidential source between December 2018 and January 2019, and showed that, before he did so, he used a telephone to set up the transactions. The affidavit also established that Prater exchanged hundreds of calls and text messages with at least two other known Vice

Lords associated with significant drug trafficking, including Alim (most recently on March 18, 2019).

Only Alim challenges probable cause on appeal, and he does so just in a limited sense—in his view, the affidavit that led to the TT-1 wiretap relies on stale information, or facts that occurred too far in the past to give rise to probable cause. *See, e.g.*, *United States v. Perry*, 864 F.3d 412, 414 (6th Cir. 2017).

But the magistrate judge concluded the information in the TT-1 affidavit was not stale, pointing both to the six controlled buys in which Prater participated that occurred within two months of the wiretap application and Prater's continued contact—via phone—with other known criminal associates up to a week before the application. And Alim did not object to this conclusion, which the district court adopted. Having failed to properly preserve a staleness argument regarding the TT-1 wiretap by not objecting to the magistrate judge's report and recommendation, Alim forfeited his right to raise the issue here. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). In any event, for the reasons the magistrate judge articulated, there is no reason to set aside the magistrate judge's holding that the information was not stale as to TT-1.

b.

Next, Alim challenges the TT-1 wiretap on the ground that it was not necessary. In his view, that wiretap application was "premature" because the government did not try other investigative techniques before applying for a wiretap, and Agent Stryker's affidavit was too conclusory when he attested that other methods would be futile. Applying the commonsense approach dictated by our caselaw, the magistrate judge disagreed and held that defendants had not overcome the deference afforded to the issuing court's judgment. Alim objected, with just one substantive sentence of argument: "Because wiretaps are so extraordinarily invasive, Congress

intended the procedure to be used only when traditional investigative methods had been tried and failed." The district court found this objection too conclusory and overruled it. And such a conclusory argument to the district court again forfeits this issue for appeal. *See Berkshire*, 928 F.3d at 530; *see also Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) (treating a general objection the same as a failure to file an objection).

At any rate, the district court did not clearly err in concluding Agent Stryker's March 26, 2019, affidavit demonstrated necessity. The affidavit sets forth ample facts showing that law enforcement reasonably considered and attempted other investigative techniques before applying for a wiretap. *Alfano*, 838 F.2d at 164. The Vice Lords, the affidavit noted, engaged in counter surveillance—they changed telephone numbers and would "drive evasively, making continued surveillance difficult or too risky." Moreover, the targeted residential area was "a very difficult area to conduct live surveillance." It was a tightknit community and "frequent, unfamiliar vehicles or unusual traffic patterns would be obvious to the [gang] and other residents who live in that area." Agent Stryker detailed why the risks associated with installing vehicle- or phone-location-tracking devices outweighed their limited potential value and explained that pole cameras utilized in the investigation did not "provide specific enough information to penetrate or dismantle" the gang. He additionally discussed the use of confidential sources, noting that law enforcement developed only one source; that source did not provide useful information, cut off contact, and law enforcement did not reasonably expect to develop other confidential sources. The affidavit also detailed other unsuccessful non-wiretap techniques, like using undercover agents, consensual monitoring, trash pulls, mail covers, grand-jury subpoenas, subject interviews, search warrants, phone-toll records, and financial investigations. Given these facts, the district court reasonably concluded that a wiretap was necessary.

3.

Agent Stryker's June 5, 2019, affidavit set forth probable cause and necessity for an intercept of Alim Turner's phone (TT-2).

a.

Agent Stryker's June 5, 2019, affidavit builds upon his March 26, 2019, affidavit with several duplicative paragraphs. In this affidavit, Agent Stryker details a new telephone number to be targeted, Alim Turner's, and adds to the target-subjects list. The affidavit notes that while the wiretap on Prater's phone resulted in the interception of him discussing a "sale of pills" and arranging a "small user amount of crack cocaine to a confidential source," the interceptions were "not very helpful in achieving the goals of th[e] investigation" because Prater was "kicked out of the Vice Lords gang" just after the intercepts began. After that, "his gang/[drug trafficking organization] related activities and communications largely ceased."

So the affidavit focuses on what Agent Stryker had learned about Alim (the overall target of the investigation) and his interactions with other known drug traffickers. Through a confidential source, law enforcement learned that Alim "receives pounds of marijuana via the mail system and sells other narcotics including crack cocaine in addition to the marijuana." The affidavit also discusses various electronic evidence already gained regarding Alim. That section of the affidavit begins by referencing text messages between Alim and another that occurred on November 4, 2018, wherein Alim discusses "need[ing] narcotics other than marijuana to sell," like heroin. It then walks through other electronic communications Alim had with defendant Stewart, a known "mid-level distributor of crystal methamphetamine and heroin in Knoxville," on November 19, 2018 (distributing methamphetamine and the purchase of an AK-47 firearm), and on December 6 and 7, 2018 (discussing Alim traveling to Atlanta for drugs), as well as communications he had

with an unknown person on January 31, 2019 (arranging the sale of marijuana). And it details the results of a pen register/trap and trace on TT-2 that showed 7,040 calls were placed to and from TT-2, and that phone received 25,536 text messages between November 28, 2018, and May 28, 2019. 1,078 of those calls and 753 of those text messages were between Alim and Stewart.

Alim Turner, Ronald Turner, and Stewart all challenge on appeal Agent Stryker's June 5, 2019, affidavit as stale.[2] Relying on the principle that "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness," *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001), the magistrate judge disagreed and observed that "the TT-2 affidavit established much more than an isolated drug transaction." In her view, the repeated nature of drug transactions over a short period of time leading up to the affidavit, along with the volume of communications between known drug distributors, were more than enough to find the affidavit was supported by fresh evidence. *See Alfano*, 838 F.2d at 162.

Over defendants' objections, the district court agreed. In addition to the various exchanges showing drug transactions that recently occurred between Alim and others, the district court found "particularly compelling the over 1000 phone calls exchanged between Defendant Alim Turner and Defendant Stewart during this 6 to 7-month period. While phone calls may be more frequent now, with the popularity of cellular phones, such a volume of phone calls between two participants is uncommon." The district court also cited Agent Stryker's "statement that he knows, from his experience, that drug traffickers are often hesitant to discuss quantities, prices, and arrange

---

[2]Alim also raises an undeveloped argument that we decline to address. He claims that the district court plainly erred by not suppressing evidence (text messages) gathered from his cell phone. The gist of his argument appears to be that the search warrant used to secure those text messages was limited in scope to investigating either his probation violation or an unrelated crime and that Agent Stryker's use of that information to secure the Title III wiretap was beyond that scope. But he admits his counsel did not raise this argument below, and instead wishes to preserve it for an ineffective-assistance-of-counsel claim.

transactions via text messages and prefer to call or meet in person." Considering all this evidence, the district court concluded there was "a fair probability that a wiretap of TT-2 would produce further evidence of criminal activity."

On appeal, Alim Turner, Ronald Turner, and Stewart all insist that the June 5, 2019, TT-2 affidavit was stale because it relied on text messages from Alim that dated back to November 2018 and that it was erroneous to infer ongoing criminal activity from the frequency of communication. We disagree, largely for the reasons stated by the district court. As in *Alfano*, "there is a recurring pattern of multiple connections among the phone calls, between and among recognized members of the conspiracy." 838 F.2d at 162. Such a recurring pattern of communications among coconspirators suggests "'a fair probability' that interception of further calls would reveal evidence of a crime." *Id.* The district court appropriately reasoned that the volume of calls between Alim and Stewart—which often followed text-message exchanges—was particularly "uncommon." With that finding plus the several recent documented phone calls and text messages between Stewart and Alim (the last being May 28, 2019), Agent Stryker's attestation that drug traffickers prefer to discuss transaction details by phone call rather than text message, and the "great deference" afforded to the issuing judge's probable-cause determination, *id.*, the district court correctly found that the affidavit did not rely on stale information. True, "mere association with conspirators is not enough to establish participation in a conspiracy," *United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999) (citation omitted), and yes, the TT-1 wiretap did not produce additional evidence concerning Alim. But the evidence set forth above establishes this is not a guilt-by-association case. And the government readily explained why there was a lack of evidence from the TT-1 wiretap, necessitating the TT-2 wiretap—the Vice Lords had (temporarily, as it turned out) kicked Prater out of the gang.

For these reasons, defendants' challenges to the TT-2 wiretap regarding probable cause are without merit.

b.

The district court did not clearly err in concluding Agent Stryker's June 5, 2019, affidavit demonstrated necessity. Agent Stryker's affidavit is largely duplicative of his March 26, 2019, affidavit concerning necessity, but it adds further connections specific to Alim Turner given the prior wiretap request was just for Prater's phone. It, for example, details multiple attempts to surveil Alim's residence and vehicles. Those attempts were unsuccessful, in large part "due to the small size of the parking lot and frequency with which residents come and go from the apartment complex" and the "risk of detection . . . outweigh[ing] the potential value of [GPS-tracking] devices." The affidavit also set forth why agents did not believe GPS tracking would be successful, why the pole camera used to observe others was not fruitful, and why other similar investigative efforts addressed in the TT-1 affidavit were deemed insufficient. The magistrate judge concluded that the TT-2 affidavit demonstrated necessity, despite using, at times, language identical to that used in the TT-1 affidavit. And the district court agreed. In its words, the facts "reflect that law enforcement gave serious consideration to non-wiretap investigative techniques prior to applying for the wiretaps, and the issuing judge was informed of the reasons for the investigators' beliefs that such alternative investigative techniques would be inadequate in this case."

Alim Turner and Ronald Turner resist this conclusion, largely noting the overlap between Agent Stryker's TT-1 and TT-2 affidavits, some purported contradictory information contained in the affidavits, and their generalized nature—i.e., challenging the conclusion that other investigative efforts were difficult in light of the community in which defendants lived—to assert the TT-2 affidavit did not sufficiently demonstrate necessity. Alim also complains that

investigators should have made greater attempts at alternative investigative techniques, asserting they should have tried more than once to conduct physical surveillance on him.  But the district court appropriately considered and rejected these arguments and noted that Alim's "only one try" assertion is not supported by the record.  Agent Stryker's affidavit makes clear that agents "attempted surveillance of [the target] locations on multiple occasions."  And regardless, as the district court found, the affidavit sufficiently set forth concerns with other methods of investigation.  We find no reason to disturb the district court's necessity finding.

4.

Agent Stryker's July 26, 2019, affidavit set forth probable cause and necessity for extending the intercept of TT-2 and for intercepting Alim Turner's other telephone (TT-3).

We resolve Alim's challenges to this affidavit summarily.  He purports to challenge this affidavit as again stale and lacking necessity, but his arguments are conclusory.  His staleness argument focuses again on just the use of his earlier text messages discussed above, and his necessity argument is identical to those he made for the first two wiretaps.  In short, he makes no substantive effort to challenge the TT-2/TT-3 wiretap, rendering this issue abandoned. *See United States v. Calvetti*, 836 F.3d 654, 662 n.1 (6th Cir. 2016).  And even if not, for the reasons discussed above, the district court appropriately concluded that the information presented in Agent Stryker's July 26, 2019, affidavit was not stale, and that the government demonstrated necessity for the TT-2/TT-3 wiretap.

5.

The final wiretap issue on appeal concerns whether the government complied with Title III's sealing requirement.

Title III directs that wiretaps "shall, if possible, be recorded on tape or wire or other comparable device." 18 U.S.C. § 2518(8)(a). "[T]o ensure the reliability and integrity of evidence obtained by means of electronic surveillance," *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990), 18 U.S.C. § 2518(8)(a) sets forth steps the government and issuing judge must take to "protect the recording from editing or other alterations," *id.* at 259 (quoting 18 U.S.C. § 2518(8)(a)). Chief is a sealing requirement. In pertinent part, the statute provides:

> *Immediately* upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom . . . .

18 U.S.C. § 2518(8)(a) (emphasis added). Alim Turner claims on appeal that the government did not comply with this "immediate" mandate concerning the TT-2 and TT-2/TT-3 wiretaps. Some additional facts are required to better frame his argument.

As set forth in the government's application to seal, the TT-2 wiretap "was taken down at approximately midnight on [Friday,] July 5, 2019. On that same date, the case agents requested that the wire contents be downloaded onto discs and forwarded to Knoxville, TN for sealing. The discs were received on [Wednesday,] July 10, 2019, and on that same date [the government] requested an appointment to seal with the Court." The district court sealed the TT-2 recordings on Thursday, July 11, 2019. All told, five days (including two weekend days) passed between the expiration of the wiretap order and the government's making the recordings available to the issuing judge.

The TT-2/TT-3 wiretap had a similarly slight delay between the wire coming down and the recordings being presented to the issuing judge. The government attested to the following in its application to seal: "The wire was taken down at approximately 6:45pm [Friday,] August 2, 2019.

On [Tuesday,] August 6, 2019, the case agents requested that the wire contents be downloaded onto discs and forwarded to Knoxville, TN for sealing. The discs were received on [Thursday,] August 8, 2019, and on that same date [the government] requested an appointment to seal with the Court." The issuing judge sealed the TT-2/TT-3 recordings on Friday, August 9, 2019. Seven days passed (including two weekend days) between the expiration of the wiretap order and the government making the recordings available to the issuing judge.

For both wiretaps, the government explained that while they were "monitored in the Eastern District of Tennessee," the servers that recorded the wiretaps' data were located outside the district. Getting that data off the servers and to Knoxville took time: "The data on those servers, oftentimes in very large quantities, must first be downloaded onto discs, then shipped via a commercial carrier to Knoxville for sealing, and then the discs must be sealed by the district court."

In Alim's view, the government did not comply with § 2518(8)(a)'s "immediately" requirement given the five- and seven-day delays between when the wiretaps terminated and when the recordings were presented to the district court. There is some support for Alim's argument here: "'Immediately' is understood as meaning 'within one or two days.'" *United States v. Wilkinson*, 53 F.3d 757, 759 (6th Cir. 1995) (citation omitted).

But as both the magistrate judge and district court appropriately recognized, § 2518(8)(a) has an exception: "Where a recording of an intercepted conversation is not sealed 'immediately' upon expiration of the authorizing order, the 'satisfactory explanation' language of § 2518(8)(a) requires that the government explain both the delay and why it is excusable, i.e., 'satisfactory.'" *Id.* (quoting *Ojeda Rios*, 495 U.S. at 265). "[O]ur review of the sufficiency of the Government's explanation for a delay should be based on the evidence presented and submissions made in the

District Court." *Ojeda Rios*, 495 U.S. at 267. A district court's finding that the government provided a satisfactory explanation for a delay is a finding of fact that we review for clear error. *Wilkinson*, 53 F.3d at 759–60.

The district court applied this exception, concluding "the administrative process necessary to obtain physical copies of the wiretap recordings [was] a 'satisfactory explanation' for a delay of less than one week in sealing the wiretap recordings at issue." *See United States v. Carson*, 969 F.2d 1480, 1488 (3d Cir. 1992) (commenting that "administrative delays" "necessitated by the process required to comply with the provisions of the Act" are a "justifiable government delay[] under the statutory scheme"). Alim disagrees, asserting that the statute does not provide for "administrative delays" and that the government should have moved faster to get the data to the issuing judge. But that argument ignores *Wilkinson*'s exception. 53 F.3d at 759. The district court did not clearly err in finding the government satisfactorily explained the delay.

For these reasons, the district court appropriately resolved defendants' various challenges to the Title III wiretaps.

B.

Stewart challenges the district court's denial of his motion to suppress evidence seized from his residence at 301 Lippencott Street, Apartment 512, Knoxville, Tennessee.

The affidavit supporting the search warrant at issue alleged that Stewart was a Vice Lord who trafficked drugs, with a particular focus on methamphetamine. Evidence obtained from wiretaps led the affiant (again, Agent Stryker) to conclude that Stewart and Alim Turner were "purchasing and then reselling illegal narcotics." Stryker recounted one telephone conversation in late June 2019 in which the two discussed their desire to sell and distribute drugs, followed a few minutes later by another call, in which Stewart agreed to sell two ounces of methamphetamine to

Alim. A few days later, Alim and Stewart discussed a plan "to have pounds of meth shipped to addresses in the Eastern District of Tennessee." Two weeks after that call, law enforcement intercepted a package containing five pounds of methamphetamine. Stewart and Gilmore (Alim had been arrested by that point) then discussed plans to purchase more methamphetamine from their supplier in Nashville. The next day, after Stewart delivered a bag of dog food to Gilmore, police stopped Gilmore while driving to Nashville and found "$13,130 concealed inside a bag of dog food." Stryker believed that this money "was headed to Nashville as payment for the meth that was being shipped to" Alim, Stewart, and other members of their organization.

Stryker's affidavit did not, however, include any specific information directly tying Stewart's residence to drug trafficking, and it conceded that "law enforcement ha[d] been unable to see exactly who comes in and out of" Stewart's residence. Instead, Agent Stryker's affidavit set forth that, based on his "training and experience with narcotics trafficking, money laundering, and criminal investigations, combined with the knowledge and information provided by other law enforcement officers . . . [d]rug dealers usually keep controlled substances and paraphernalia . . . at places under their control, such as their residences." And it cited some of our caselaw concluding that "in the case of drug dealers, evidence is likely to be found where the dealers reside." *See, e.g.*, *United States v. Goward*, 188 F. App'x 355, 359 (6th Cir. 2006). As a result of the search, law enforcement found a firearm, drug paraphernalia, and suspected drugs. Stewart moved to suppress this evidence, but the district court denied his motion, concluding that the warrant established probable cause because Stewart was "a major player in a large, ongoing drug trafficking operation." The district court also concluded that suppression was not warranted because the good-faith exception applied.

We do not need to decide whether probable cause existed for the search because the evidence obtained during the search was nevertheless admissible due to the *Leon* good-faith exception. "Under *Leon*, the exclusionary rule does not bar from admission 'evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Leon*, 468 U.S. at 921 (internal quotation marks and brackets omitted). Moreover, "only in exceptional circumstances is law enforcement to disregard a magistrate judge's authorization—for instance, when a warrant is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, or when a warrant is so facially deficient that it could not reasonably be presumed valid." *United States v. Richards*, 659 F.3d 527, 542 (6th Cir. 2011) (internal quotation marks and brackets omitted).

The affidavit established that Stewart was part of a continuous and ongoing drug-trafficking operation—it tied Stewart to a five-pound shipment of methamphetamine, a separate transaction for two ounces of methamphetamine, and a scheme to purchase $13,130 of drugs from Nashville. But the affidavit contained no direct evidence linking Stewart's trafficking activities to his house. At the time of the search, cases in this circuit came out differently on whether this evidence sufficed for probable cause. *Compare, e.g.*, *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) *with United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991). Those "conflicting conclusions in that line of cases" means we must "forgive[] officers on good faith grounds for failing to appreciate our precedential nuances." *United States v. Sanders*, 106 F.4th

455, 470 (6th Cir. 2024) (en banc). The *Leon* good-faith exception thus precludes exclusion. *See also United States v. Neal*, 106 F.4th 568, 573 (6th Cir. 2024) (per curiam); *United States v. Reed*, 993 F.3d 441, 450–52 (6th Cir. 2021); *United States v. Ardd*, 911 F.3d 348, 351–52 (6th Cir. 2018).

For these reasons, we affirm the district court's denial of Stewart's motion to suppress.

### III.

Defendants raise five issues concerning their trial: (A) the admission of gang-affiliation evidence; (B) the sufficiency of the evidence supporting their convictions and alleged variance between the indicted conspiracy and proofs at trial; (C) the jury instructions on conspiracy; (D) an inconsistent jury verdict; and (E) prosecutorial misconduct. None have merit.

### A.

Alim Turner and Stewart challenge the district court's admission of evidence related to their gang affiliation under Federal Rule of Evidence 403, arguing that the unfair prejudice from such evidence outweighed its probative value. In denying their pretrial motion in limine to exclude any mention of "gang affiliation" or "Vice Lords," as well as overruling their objections to such evidence throughout trial, the district court found that this evidence was relevant to the conspiracy charges and that any unfair prejudice to defendants did not substantially outweigh the evidence's probative value.

Under Rule 403, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "We review a district court's Rule 403 ruling for abuse of discretion." *Gibbs*, 182 F.3d at 429. So we "take[] a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect, and will hold that the district court erred only if the latter [substantially] outweighs the

former." *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir. 1997); *see also United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984).

We have repeatedly held that evidence of gang affiliation may be admitted as direct evidence, relevant to and highly probative of participation in a conspiracy. *See, e.g.*, *United States v. Ford*, 761 F.3d 641, 649–50 (6th Cir. 2014); *Gibbs*, 182 F.3d at 430; *United States v. Williams*, 158 F. App'x 651, 653–54 (6th Cir. 2005); *United States v. Shields*, 850 F. App'x 406, 410–11 (6th Cir. 2021). Conversely, gang-affiliation evidence "is inadmissible if there is no connection between the gang evidence and the charged offense." *Ford*, 761 F.3d at 649–50 (citation omitted). The simple fact that evidence of gang affiliation may be prejudicial to a defendant does not make it inadmissible, *see Williams*, 158 F. App'x at 653, rather, it must "tend[] to suggest decision on an improper basis" to be excluded under Rule 403, *Gibbs*, 182 F.3d at 430 (citation omitted).

Alim and Stewart take issue with testimony from three cooperating co-conspirators and from an FBI Task Force Officer, as well as assertions the government made during its opening statement and closing argument. Many of these challenged statements detail the Vice Lords' organizational structure, name its members, and describe the crimes they commit, including drug- and firearm-related crimes. Mainly, Alim and Stewart challenge the testimony suggesting that they and other Vice Lords committed uncharged crimes or crimes that were not the subject of this case. In their view, despite their concessions that such testimony is relevant, it still should have been excluded because of its danger of unfair prejudice—namely, that the jury might convict them because of the Vice Lords' violent tendencies and commission of other crimes, not the crimes charged.

The district court did not abuse its discretion in admitting this evidence.[3]   Although Alim and Stewart are correct that some of the testimony suggested that the Vice Lords have committed (and generally commit) violent crimes such as robbery and murder outside the scope of this prosecution, that testimony was interwoven with highly probative conversations about drug dealing and firearms.   Other times, the challenged testimony gave general background information about the Vice Lords organization, which, as the district court recognized, "is highly probative of a defendant's participation in a conspiracy to distribute drugs" with that organization. *See Shields*, 850 F. App'x at 410.   While this testimony might have been prejudicial to Alim and Stewart, its prejudicial character did not "substantially outweigh[]" its probative value, so it was properly admitted in accordance with Rule 403. *See id.* at 411.   Moreover, the district court gave a limiting instruction about this evidence no fewer than six times throughout the trial, repeatedly reminding the jury that defendants were on trial only for the crimes charged and that being in a gang is not against the law.

B.

Defendants raise a host of sufficiency-of-the-evidence challenges.   A defendant claiming insufficient evidence to support a conviction "faces a high bar" on appeal. *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017).   This is because we must uphold a jury's conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).   We will sustain a conviction based on circumstantial evidence

---

[3]The government contends that some of the challenged testimony should be assessed under the plain-error standard of review because defendants did not contemporaneously object to its admission.   But defendants' motion in limine sufficiently preserved this issue, and their Rule 403 argument fails under either abuse-of-discretion or plain-error review.

alone, and the evidence need not disprove every "hypothesis except that of guilt." *United States v. Lindo*, 18 F.3d 353, 357 (6th Cir. 1994) (citation omitted). A sufficiency claim does not require us to "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted). Rather, we "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Id.* (citation omitted).

1.

Ronald Turner was convicted of three counts: (1) conspiracy to distribute various drugs (count one); (2) conspiracy to commit money laundering (count three); and (3) aiding and abetting the attempted possession with intent to distribute methamphetamine (count four). He challenges only his money-laundering-conspiracy conviction, which required the government to prove that Ronald "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) either intended to promote that unlawful activity or knew that the transaction is designed in whole or in part to disguise the source, ownership or control of the proceeds." *United States v. Matthews*, 31 F.4th 436, 447 (6th Cir. 2022) (alterations and internal quotation marks omitted); *see also* 18 U.S.C § 1956(h). Sufficient evidence supports this conviction.

"The paradigmatic example of this crime is a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010); *see United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020) (per curiam). And that is what defendants did. Consider, for example, Alim Turner telling Ronald Turner on a recorded conversation, "I'm tryin' to stack so I can get some more drugs"; i.e., Alim was saving the drug profits to "[r]eup" on future drug purchases. Or take another call between the

two wherein they discussed having "only . . . a week" to make hundreds of dollars in drug sales to pay off a drug debt. Other examples of such "reinvest[ment]" abound. *Tolliver*, 949 F.3d at 248 (emphasis omitted). For example, the jury heard multiple calls between the brothers suggesting that they transferred money through Cash App and Western Union to facilitate drug sales.

On appeal, Ronald Turner suggests that their use of Cash App and Western Union to exchange money was insufficient to show either an agreement to launder money or that the transactions were "designed in whole or in part to disguise the source, ownership or control of the proceeds." *Matthews*, 31 F.4th at 447 (alteration omitted). Regarding the latter, however, money-laundering conspiracy requires only a financial transaction that was "*either* intended to promote that unlawful activity *or* . . . designed in whole or in part to disguise the source, ownership or control of the proceeds." *Id.* (emphasis added; internal quotation marks and alteration omitted). And the government more than demonstrated that defendants' reinvestment of the drug-sale proceeds "promoted" future unlawful activity. As to the former, a jury could reasonably infer Ronald's intent to join the money-laundering conspiracy given the evidence of both his drug-trafficking efforts generally and how he and his brother structured financial transactions to facilitate their drug trafficking.

2.

Demetrius Bibbs was convicted of three counts: (1) conspiracy to distribute heroin (count one); (2) possession with intent to distribute heroin while being aided and abetted by another (count 12); and (3) being a felon in possession of a firearm (count 15). He challenges his conspiracy-to-distribute and firearm convictions.

a.

"To sustain a conviction for drug conspiracy under § 846, the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) (citation omitted). The government need not establish a formal agreement; rather, "a tacit or material understanding" is enough, and a defendant's "knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). Upon proof of an agreement, a defendant's connection to the conspiracy "need only be slight, and the government is only required to prove that the defendant was a party to the general conspiratorial agreement." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (internal quotation marks omitted).

The jury heard evidence tying Bibbs to the conspiracy through his relationship with Camaron Billips. The two sold heroin "together." Billips testified that Bibbs formerly sourced heroin from a man nicknamed "Fat T" until he died in 2019. So Billips helped Bibbs get heroin from Alim Turner instead. For example, Billips testified that Bibbs gave him money to purchase approximately seven grams of heroin from Alim. Although Bibbs might not have known other Vice Lords higher in the chain, it was reasonable for the jury to find that he participated in the conspiracy by using Billips as an intermediary to purchase heroin from Alim for resale. *See Martinez*, 430 F.3d at 332–33 ("In a drug distribution 'chain' conspiracy, it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy.").

b.

To convict Bibbs of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), the government was required to prove: (1) Bibbs was a convicted felon; (2) Bibbs possessed a firearm; and (3) the firearm traveled in or affected interstate or foreign commerce. *United States v. Vichitvongsa*, 819 F.3d 260, 275 (6th Cir. 2016). Bibbs stipulated to the first and third elements and on appeal argues only that the government failed to present sufficient evidence that he possessed a firearm (a Glock 22 with an extended magazine). The government may establish possession by actual or constructive possession of a firearm, *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008), and here, the evidence presented at trial supports either theory.

Billips testified that he picked up Bibbs from the hospital on July 24, 2019, following the birth of Bibbs's son. Billips had the Glock 22 handgun at that time, but he told the jury that it belonged to Bibbs, so he "gave it back to" Bibbs. When the two arrived at Bibbs's house, Bibbs put the gun in his room. Bibbs uploaded a video—also on July 24, 2019—to Facebook of him that both depicted his possession of a Glock and talked about his shooting a Glock twenty-seven times, which the jury heard would have required an extended magazine. Later that evening, Billips retrieved the gun, and law enforcement (pursuant to a search warrant) discovered it next to the air mattress Billips slept on the following day. The Glock seized by law enforcement had an extended magazine, fitting the description from the Facebook video.

"Actual possession requires that a defendant have immediate possession or control of the firearm," *id.*, and given Billips's testimony and the Facebook evidence, a rational juror could have concluded Bibbs actually possessed the firearm. Moreover, the Glock was discovered at Bibbs's house. "Proof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession." *United States v. Kincaide*, 145 F.3d 771, 782 (6th

Cir. 1998) (internal quotation marks omitted).  Put differently, "[a] jury is entitled to infer that a person exercises constructive possession over items found in his home." *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998) (internal quotation marks omitted).  So constructive possession independently supports Bibbs's conviction.

Bibbs's arguments to the contrary do not persuade.  Regarding actual possession, he argues the jury did not credit Billips's testimony because it acquitted Bibbs on two counts of possessing a firearm in furtherance of drug-trafficking crimes.  But we must "resolve all issues of credibility in favor of the jury's verdict." *Jackson*, 470 F.3d at 309 (citation omitted).  As to constructive possession, Bibbs claims "[t]here is no credible proof that Mr. Bibbs had the requisite knowledge of the firearm's presence and the intent to exercise dominion and control of the firearm."  The record again belies that argument given Billips's testimony, which established that Bibbs possessed the Glock even if the jury did not tie his possession to his drug-trafficking crimes.

3.

The last "sufficiency" challenge relates to claims by Ronald Turner and Bibbs that the government proved the existence of multiple conspiracies at trial, thus reflecting a fatal variance from the indictment.

A variance occurs when evidence presented by the government at trial "proves facts materially different from those alleged in the indictment." *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008) (citation omitted).  A variance is "fatal" and requires reversal when the discrepancy affects the defendant's substantial rights. *United States v. Hurst*, 951 F.2d 1490, 1501 (6th Cir. 1991) (adding that "[s]ubstantial rights are affected only when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions" (internal quotation marks omitted)).

"Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often 'chain' conspiracies." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982). For example, we have held that a "single chain conspiracy" existed when a defendant "obtained large amounts of marijuana from a source in Mexico, used a driver to transport the marijuana to Tennessee, and then sold or fronted the marijuana to others, who in turn resold or fronted the marijuana." *United States v. Vaughan*, 512 F. App'x 459, 461 (6th Cir. 2013) (per curiam). The same was true when other defendants worked together to purchase drugs, evade law enforcement, and "repeatedly engaged in regular, high-volume drug sales." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006). And "evidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (citation omitted).

"The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). "To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *Id.* at 653. Viewing the evidence in the light most favorable to the government, a rational juror could conclude that defendants had knowledge of, and agreed to participate in, a single, overarching conspiracy to obtain and sell numerous types and quantities of illicit drugs.

Begin with Ronald Turner. His role was not, as he suggests, just having conversations with and giving "advice" to his brother concerning Alim's "drug trafficking crimes." The evidence adduced at trial reflects Ronald's *extensive* role in directing the entire conspiracy: (1) he was the link to one of the gang's major drug sources, "Pelon"; and (2) he helped guide how drugs were

-27-

purchased and sold. Based on this and other evidence at trial, a rational juror could conclude that he adopted the conspiracy's main objective to traffic drugs and was generally aware of others' criminal activities.

The same goes for Bibbs. Although he contends he conspired only with Billips to sell only heroin, a rational juror could conclude that Bibbs's participation was not so limited, considering the evidence discussed above for his sufficiency challenge to his conspiracy-to-distribute conviction. In the district court's words, "[a]t the very least, the evidence establishes that [Bibbs] knew that Billips was engaged in drug trafficking activities, that Billips had a source of supply in Knoxville (Turner), and that he and Billips could sell heroin obtained from Turner together. . . . Billips is the link between defendant and the larger conspiracy, and the fact that he did not know other co-conspirators is irrelevant."

4.

For these reasons, defendants' sufficiency-of-the-evidence challenges are without merit.

C.

Ronald Turner challenges, for the first time, the district court's conspiracy-liability instruction. When a defendant fails to object to a jury instruction in district court, we review for plain error. *United States v. Hofstetter*, 80 F.4th 725, 730 (6th Cir. 2023). "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012) (citation omitted).

The district court gave a conspiracy-liability instruction, which explained that defendants could be convicted of either charged conspiracy (drug trafficking and money laundering) in two ways: first, if they "personally committed or participated in these crimes" and "knowingly and

voluntarily joined the conspiracy"; and second, by being responsible for the acts of the other conspiracy members that were within the scope of the conspiracy agreement and helped advance the conspiracy. Ronald argues that the latter portion of this instruction is erroneous because so-called *Pinkerton* liability—which "allows members of a conspiracy to be held liable for reasonably foreseeable substantive offenses committed by coconspirators in furtherance of the conspiracy," *United States v. Woods*, 14 F.4th 544, 552 (6th Cir. 2021)—does not apply to inchoate crimes. He further argues that the instruction allowed the jury to, in his words, "convict [him] of the narcotics and money laundering conspiracies merely through his participation in the other conspiracy."

We cannot agree. Though conspiracy members may be liable for only "substantive offenses" committed by their co-conspirators (not for inchoate offenses such as conspiracy or attempt), *United States v. Hamm*, 952 F.3d 728, 744 (6th Cir. 2020), the instruction here did not allow the jury to convict Ronald of either conspiracy based on his participation in the other conspiracy. The instruction clearly stated that, for the jury to convict on conspiracy, it needed to find "that the defendant was a member of the conspiracy charged *in the relevant count of the indictment*." (Emphasis added). In other words, the jury could not convict him (through *Pinkerton* liability) of the drug-conspiracy count based on his participation in the money-laundering conspiracy, and vice versa. Therefore, the district court did not err (let alone plainly so) in giving this unobjected-to instruction to the jury. *United States v. Buchanan*, 933 F.3d 501, 508 (6th Cir. 2019). He is not entitled to relief on this issue.

D.

The operative indictment charged Bibbs with three firearms counts: two counts of possessing firearms in furtherance of a drug-trafficking crime (counts two and 13); and one count of being a felon in possession of a firearm (count 15). The jury acquitted Bibbs on the two

possession-in-furtherance-of charges but convicted him of being a felon in possession. Bibbs argues the jury's verdict was inconsistent and thus rises to the level of "arbitrariness or irrationality" meriting relief. *United States v. Randolph*, 794 F.3d 602, 610 (6th Cir. 2015) (citation omitted). We disagree.

"[I]nconsistent verdicts are constitutionally tolerable." *Dowling v. United States*, 493 U.S. 342, 353–54 (1990). And, largely because "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts," *United States v. Powell*, 469 U.S. 57, 67 (1984), inconsistent verdicts "generally are not reviewable," *Randolph*, 794 F.3d at 610. But there are two exceptions: (1) if the verdict is "marked by such inconsistency as to indicate arbitrariness or irrationality," *United States v. Lawrence*, 555 F.3d 254, 263 (6th Cir. 2009); and (2) "where a guilty verdict on one count necessarily excludes a finding of guilt on another, i.e. a mutually exclusive verdict," *Randolph*, 794 F.3d at 610–11 (internal quotation marks omitted).

According to Bibbs, his acquittal on the two possession-in-furtherance-of charges is inconsistent with his felon-in-possession conviction because all three charges included possession of a firearm on July 25, 2019. But there is no inconsistency—the former required the jury to link Bibbs's firearm possession to drug-trafficking activities, while the latter needed the jury only to conclude that Bibbs's possessed a firearm. *Compare* 18 U.S.C. § 924(c)(1)(A), *with* § 922(g)(1). The jury's verdict reflects its finding that Bibbs possessed a firearm, just not in furtherance of his drug-trafficking crimes; there is nothing inconsistent about that conclusion. And even if otherwise, it does not rise to the level of being arbitrary or irrational.

E.

Stewart contends that the government engaged in prosecutorial misconduct by misleading the jurors in questioning and closing argument regarding the cooperating witnesses' sentencing exposure.

We apply a two-step inquiry to resolve questions of prosecutorial misconduct. "First, we determine whether prosecutorial statements allegedly constituting misconduct were improper. Next, if we find impropriety, we 'then determine whether the improprieties were flagrant such that a reversal is warranted.'" *United States v. Eaton*, 784 F.3d 298, 309 (6th Cir. 2015) (citation omitted). Under this second prong of the analysis, we consider four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002) (citation omitted).

We review the challenged statements "within the context of the trial to determine whether such comments amounted to prejudicial error." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). We also give "wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were otherwise fair." *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (internal quotation marks omitted). Put differently, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States*

*v. Young*, 470 U.S. 1, 11 (1985).  Because Stewart did not preserve this issue for appeal, we review

for plain error.  *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011).

Stewart contends the government elicited cooperating witnesses' testimony that he says

"was designed to leave the jury with the impression that each witness was likely to get a huge

sentence despite their cooperation and regardless of whether they testified to the government's

version of the facts."  According to Stewart, Christopher Hounschell—a main methamphetamine

source—is the exemplar.  Hounschell testified that he pleaded guilty pursuant to a plea agreement,

agreed to testify against his co-defendants, and faced a twenty-year mandatory-minimum prison

term.  He then detailed the terms of his plea agreement, which is the part that Stewart finds

objectionable:

> Q. What do you understand your obligation to be under this plea agreement?
> A. To tell the truth.
> Q. And if you tell the truth, what do you understand the obligation of the United States to be when it comes time for you to be sentenced?
> A. Give me my time.
> Q. Okay. At your sentencing, do you have an expectation that the United States will convey to Judge Varlan your cooperation?
> A. Yes, sir.
> Q. Letting him know what you did.
> A. Yes, sir.
> Q. Have you been sentenced yet in this case?
> A. No, sir.
> Q. And other than me agreeing to let Judge Varlan know about the nature and extent of your cooperation, have you received any other promises in this case?
> A. No, sir.

In closing, the prosecutor highlighted Hounschell's sentencing exposure:

> So all of these, you know, the pejorative way in which the defense attorneys cast the plea bargaining process here, they said it's gifts.  Remember, gifts from the government.  Chris Hounschell is looking at close to 30 years' minimum mandatory.  If that's a gift, I'd hate to see what a penalty is; but even with that, if Chris Hounschell lies, that's what he said, plea agreement goes away.  Perjury.

Stewart contends that these statements were reversible error because the jury was not informed how a defendant can avoid a mandatory minimum sentence via cooperation through a U.S.S.G. § 5K1.1 motion by the government and was therefore left with the impression that the cooperating defendants were going to serve mandatory sentences. (Hounschell was ultimately sentenced to 160 months.)

There was no plain error here mandating reversal. We normally condone the government's use of witness plea agreements, *see United States v. Trujillo*, 376 F.3d 593, 608–09 (6th Cir. 2004); *see also United States v. Wells*, 623 F.3d 332, 341 (6th Cir. 2010), and there was nothing improper with the sentencing-exposure testimony elicited by the government.[4] The record does not reflect that the government improperly suggested the cooperating witnesses could not go below their mandatory-minimum sentences. *See United States v. Morris*, 498 F.3d 634, 639 (7th Cir. 2007) To the extent Stewart contends the government needed to explain the § 5K1.1 process, no binding caselaw requires that. *Cf. United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) ("A lack of binding case law that answers the question presented will also preclude our finding of plain error."). And regardless, that process was presented to the jury on cross examination and in closing arguments.

To be sure, the prosecutor stated Hounschell was "looking at close to 30 years' mandatory minimum," when all he was facing was 20. But that impropriety was not so flagrant to warrant reversal—it appears to have been an accidental and isolated misstatement and Stewart does not

---

[4]Stewart's brief lists those witnesses and what they testified their sentencing exposure to be, but, with the exception of Hounschell, it does not otherwise specifically identify problematic testimony. Stewart's argument as to those five—Camaron Billips, Michael Stewart, Seth Curtis, Joshua Carmley, and Kiante Cooper—is perfunctory and therefore forfeited. *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016). And regardless, their testimony is of a piece with Hounschell's.

contend that this statement undermined the otherwise strong evidence against him.  *See Eaton*, 784

F.3d at 309; *Modena*, 302 F.3d at 635.

F.

For these reasons, none of defendants' various trial-related issues are meritorious.

IV.

Finally, defendants raise various issues regarding their sentences, which span from

challenges under the Eighth Amendment to the sentences' procedural and substantive

reasonableness.  By any measure, defendants all received lengthy sentences (with most receiving

life).  Whether young adults in their 20s should presumptively spend the rest of their lives in prison

for drug trafficking and related offenses is a serious question.  But it is a question of policy—one

for Congress, the Sentencing Commission, and ultimately the American people to decide.  As set

forth next, we reject defendants' sentencing arguments based on our binding Eighth Amendment

caselaw, the deference we must give to within-Guidelines sentences, and the district court's well-

articulated consideration of the appropriate sentencing factors under 18 U.S.C. § 3553(a) when it

concluded that defendants' serious crimes warranted serious sentences.

A.

Gilmore and Stewart were between 19 and 21 years old when they committed their offenses

of conviction and were both sentenced to life in prison plus five years (due to the mandatory

consecutive nature of the sentences for their § 924(c) convictions).  They assert their sentences

violate the Eighth Amendment for two reasons:  (1) they were too young to receive life sentences,

and (2) their sentences were unconstitutionally disproportionate.

We review for plain error, for neither Gilmore nor Stewart raised an Eighth Amendment

argument in their sentencing memoranda or at sentencing.  Although Gilmore argued that he

should receive a lighter sentence because his brain was still developing when he committed his crimes, that argument was never tied to the Eighth Amendment until his briefs on appeal. Instead, he made this argument in the context of requesting a downward variance—a different basis for invoking his age. That framing of the issue did not give the district court an opportunity to decide whether Gilmore's eventual sentence violated the Eighth Amendment, especially because the Eighth Amendment was never mentioned in Gilmore's sentencing memorandum or at his sentencing hearing. *See United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004). As for Stewart, his defense counsel did not mention the Eighth Amendment in his sentencing memorandum, and she did so only in passing at sentencing, asserting that, in her mind, the government's proposed life sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. That offhand comment was not elaborated on further and came in the context of arguing that defense counsel did not "see how [a life sentence] would at all meet the sentencing mandate of § 3553(a) by being a sentence that's . . . not greater [than] necessary to make sure that it deters the defendant and meets the goals of sentencing." Consequently, neither Gilmore nor Stewart raised their Eighth Amendment arguments before the district court. We therefore review these Eighth Amendment arguments for plain error. *See, e.g.*, *United States v. Droganes*, 728 F.3d 580, 590–91 (6th Cir. 2013) (holding that we review unpreserved constitutional arguments for plain error); *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) ("To preserve the argument, then, the litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it.").

"Plain errors are limited to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." *United States v. Henning*, 286 F.3d 914, 920 (6th Cir. 2002) (citation

omitted). "Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice." *Id*. at 921 (citation omitted). Thus, Gilmore and Stewart "must show (1) error (2) that was obvious or clear (3) that affected [their] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Phillips*, 516 F.3d 479, 487 (6th Cir. 2008) (internal quotation marks omitted). "This is a heavy burden for [them] to bear, for the plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice." *Id.* (internal quotation marks omitted).

Binding precedent forecloses Gilmore and Stewart's age-based argument. They were over 18 years old when they committed the offenses of conviction. Precedent dictates that, unlike juveniles, they fall on the adult side of the Eighth Amendment's "bright line" and cannot rely on their youth to invoke the Eighth Amendment. *United States v. Marshall*, 736 F.3d 492, 497–500 (6th Cir. 2013); *see also In re Manning*, 24 F.4th 1107, 1109 (6th Cir. 2022) (order) (reiterating the "bright line" discussed in *Marshall*).

Their proportionality arguments fare no better. We generally consider three factors when determining whether a sentence is so disproportionate that it violates the Eighth Amendment: "(1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions." *United States v. Abdulmutallab*, 739 F.3d 891, 906 (6th Cir. 2014) (internal quotation marks omitted). Consideration of the second and third factors "is appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* (internal quotation marks omitted). "When evaluating the gravity of the offense, a court may consider the harm caused or threatened to the victim or society, and the culpability of the offender." *Id*. (internal quotation marks omitted). And

we have adopted a "narrow proportionality principle," under which "there is no requirement of strict proportionality; the [E]ighth [A]mendment is offended only by an extreme disparity between crime and sentence." *Id*. at 906–07 (citations omitted). Indeed, "comparative proportionality is not constitutionally mandated." *United States v. Layne*, 324 F.3d 464, 474 (6th Cir. 2003).

Generally, a "sentence within the statutory maximum . . . does not constitute cruel and unusual punishment" because "[w]e grant substantial deference to legislative determinations of the types and limits of punishments for crimes." *United States v. Sherrill*, 972 F.3d 752, 773 (6th Cir. 2020) (citations omitted). We have even gone a step further when reviewing within-Guidelines sentences, holding that "an Eighth Amendment challenge must fail if a defendant receives a sentence within the guideline range . . . when the guideline range contemplates the gravity of the offense." *Abdulmutallab*, 739 F.3d at 907.

The Guidelines recommend life in prison for any defendant with an offense level of 43, regardless of the defendant's criminal history. U.S.S.G. ch. 5, pt. A (Sentencing Table); *Sherrill*, 972 F.3d at 773. And in the "rare" circumstance in which an offense level is greater than 43, the Guidelines treat the offense level as 43. U.S.S.G. ch. 5, pt. A, cmt. n.2. That rare circumstance applied to Gilmore and Stewart because of the gravity of their offenses—they participated in a large conspiracy that distributed a highly addictive and harmful drug (methamphetamine) in such amounts that placed their offense level in the highest drug-weight category contemplated by the Guidelines. While sentencing Gilmore and Stewart, the district court recognized this serious conduct while also expressly considering their youth. It was not egregious for the district court to impose within-Guidelines sentences of life imprisonment, so their sentences did not offend the Eighth Amendment's prohibition against cruel and unusual punishment. *See Sherrill*, 973 F.3d at 773.

B.

We now turn to defendants' individual arguments regarding their respective sentences. We review sentences for reasonableness, using an abuse-of-discretion standard. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). "Reasonableness review has both substantive and procedural components." *United States v. Keller*, 498 F.3d 316, 322 (6th Cir. 2007). The procedural component requires us to ensure that the district court: "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other [18 U.S.C.] § 3553(a) factors as well as . . . arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). In evaluating the procedural reasonableness of a defendant's sentence, "we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009). And the substantive component requires us to consider whether a defendant's sentence "is too long" because the district court "placed too much weight on some of the § 3553(a) factors and too little on others." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). A within-Guidelines sentence is presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

1.

Alim Turner was convicted of: (1) conspiracy to distribute various drugs (count one); (2) aiding and abetting the possession of firearms in furtherance of a drug-trafficking crime (count two); (3) conspiracy to commit money laundering (count three); (4) aiding and abetting the possession with intent to distribute methamphetamine (count four); (5) distribution of 50 grams or more of methamphetamine (count eight); (6) possession of a firearm in furtherance of a drug-trafficking crime (count nine); and (7) distribution of five grams or more of methamphetamine

(count 18). The district court calculated Alim's offense level at 48, which it then reduced to the maximum level of 43 and combined with his Criminal History Category of IV to produce a Guidelines range of life in prison, plus two mandatory consecutive five-year sentences for the § 924(c) offenses (counts two and nine). The court then imposed a life-plus-ten-years sentence.

Alim challenges only the substantive reasonableness of his sentence. In imposing his sentence, the district court underscored the depth of Alim's involvement in overseeing a violent gang that used firearms to distribute massive amounts of methamphetamine and other illegal drugs. In the district court's words, he engaged in "extremely serious offense conduct" while under supervision for a prior drug-related offense. The district court also considered the other various § 3553(a) factors, detailing, for example, Alim's history and characteristics; the need to promote respect for the law and just punishment; deterrence; public protection; and the provision of needed education, care, and treatment. In short, the district court gave a reasoned decision for imposing a life sentence while considering and rejecting Alim's arguments for a lesser sentence. Through the "highly deferential" review standard for substantive reasonableness challenges, *Rayyan*, 885 F.3d at 442, the district court's sentencing of Alim stands on firm ground.

Alim resists, asserting a greater-than-life sentence cannot be substantively reasonable because it circumvents rehabilitation. True, § 3553(a)(2)(D) requires a district court to *consider* "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," but it does not mandate that rehabilitation supersede other considerations. Rather, under substantive-reasonableness review, our role is to consider whether the district court's balancing of all the § 3553(a) factors fell outside the wide berth of abuse-of-discretion review. *See Rayyan*, 885 F.3d at 442. And here, the district court considered rehabilitative efforts, yet it still found a

within-Guidelines sentence of life imprisonment to be appropriate considering the enormity of

Alim's offense conduct and the escalating nature of his criminal history. In short, we discern no

abuse of discretion in the district court's decision to weigh heavily the severity of Alim's crimes

over his mitigating circumstances.

2.

Ronald Turner was convicted of: (1) conspiracy to distribute various drugs (count one);

(2) conspiracy to commit money laundering (count three); and (3) aiding and abetting the

attempted possession with intent to distribute methamphetamine (count four). The district court

calculated his offense level at 48, which it then reduced to a maximum level of 43 and combined

with his Criminal History Category of IV to produce a Guidelines range of life in prison. The

court then imposed a life sentence. Ronald raises two procedural reasonableness challenges and

asserts that his sentence is substantively unreasonable.

a.

i.

For sentencing purposes, Ronald's convictions were grouped into two categories: (1) his

drug counts and (2) his conspiracy-to-commit-money-laundering conviction. For the former,

Ronald's base-offense level was 38, which the district court adjusted upward to 42 after applying

two specific-offense characteristics (distributing controlled substances in prison under U.S.S.G.

§ 2D1.1(b)(4) and involving a minor under § 2D1.1(b)(16)(B) after having received an

aggravating-role adjustment under § 3B1.1). These enhancements were important for how the

district court calculated Ronald's base-offense level for conspiracy to commit money laundering.

Under U.S.S.G. § 2S1.1(a), the base-offense level for money-laundering conspiracy is

"[t]he offense level for the underlying offense from which the laundered funds were derived." The

application note to this Guidelines provision states that, "application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1 cmt. n.2(C). Following these directives, the district court looked to the adjusted-offense level from Ronald's drug counts (42) to calculate his base-offense level for the money-laundering-conspiracy conviction. It then found applicable two more enhancements, bringing that adjusted-offense level to 48. So, being the higher of the two, his money-laundering-conspiracy conviction drove his Guidelines calculation.

Ronald argues the district court erred in calculating the base-offense level for his money-laundering-conspiracy conviction by including what he says are Chapter Three adjustments from his underlying offense (i.e., the drug counts), in violation of Application Note 2. His argument targets the enhancement he received under § 2D1.1(b)(16)(B) for involving a minor (not a Chapter Three adjustment) because that enhancement can be applied only if a defendant also receives an aggravating-role enhancement under § 3B1.1 (a Chapter Three adjustment).

Because Ronald failed to advance that argument below, we review the district court's calculation for plain error. *Bostic*, 371 F.3d at 871. Ronald disagrees, arguing that his counsel did object to the application of § 3B1.1. That much is true—he took issue with his classification as an organizer/leader of the conspiracy that garnered a four-level enhancement. But he never asserted "with [a] reasonable degree of specificity which would have adequately apprised the trial court" that he objected to application of the enhancement under § 2D1.1(b)(16)(B) for purposes of calculating his base-offense level for his money-laundering-conspiracy conviction. *Id.* So plain-error review applies.

The district court did not err, plainly or otherwise. Ronald received two enhancements for his drug counts, both under Chapter Two. True, he was eligible for the involving-a-minor enhancement under § 2D1.1(b)(16)(B) only because he received an aggravating-role adjustment under Chapter Three for the money-laundering offense. But the involving-a-minor enhancement itself is not a Chapter Three adjustment. The district court first appropriately calculated the base-offense level for Ronald's conspiracy-to-commit-money-laundering conviction under § 2S1.1(a)(1). It then applied an aggravating-role adjustment to that base-offense level, which escalated Ronald's offense level to 48. Following the Guidelines' cross-referenced incorporations, the district court accurately determined Ronald's base-offense level for his money-laundering conviction. *See* U.S.S.G. § 2S1.1 cmt. n.2(C).

ii.

Section 3B1.1(a) of the Guidelines increases a defendant's base-offense level by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." To discern leadership status, a court considers various factors, including: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4. "A district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012). The government must establish that this adjustment applies by a preponderance of the evidence. *United States v. Mack*, 808 F.3d 1074, 1085 (6th Cir. 2015). We review a district court's factual findings

for clear error and its legal conclusion that a person was an organizer or leader under § 3B1.1 deferentially. *United States v. Washington*, 715 F.3d 975, 982–83 (6th Cir. 2013).

The presentence report recommended that the district court apply a § 3B1.1(a) leader/organizer enhancement when calculating Ronald's offense level for conspiracy to commit money laundering. Over Ronald's objection, the district court agreed, finding that there was "ample evidence in the record to show by a preponderance of the evidence that defendant was a leader or organizer of the instant *offenses*." (Emphasis Added). To support this finding, the district court relied heavily on intercepted phone calls that showed Ronald "had at least some degree of decisionmaking authority regarding the purchasing, as well as pricing of drugs for redistribution in the instant offenses." And it noted Ronald was the "link" to the source of methamphetamine supply, instructed others on what to do, and even recruited others (including minors) to facilitate the gang's efforts.

On appeal, Ronald argues that "[w]hile there was evidence in the record that [he] may have had an aggravating role in a drug conspiracy, there was no evidence of [his] organizing role in the money laundering conspiracy, or that the money laundering conspiracy involved 5 or more persons." We disagree. For one, any error would be harmless because, to quote the government, "[i]f the four-level aggravating-role enhancement were applied to the drug conspiracy and not the money-laundering offense, [Ronald]'s total offense level would be 46—still capped at 43 [and thus h]is Guidelines range would remain the same." But for another, the sentencing transcript makes clear that the district court made sufficient findings for both conspiracies. Consider just this brief description by the district court:

> Again, throughout numerous calls involving the conspiracy, [Ronald] instructed Alim Turner to send him various amounts of money that had been obtained through the drug conspiracy often to pay sources of supply.

And, additionally, going back to the June 17, 2019 recorded call, [Ronald] instructed Alim Turner on how to maintain drug proceeds, instructed him to keep such money split between a bank account and a safe to avoid detection. [Ronald] also instruct[ed] Alim Turner to set up a fake modeling business as an explanation for the funds he was obtaining from the drug distribution conspiracy.

Given these factual findings and the jury's conviction of five defendants on the money-laundering-conspiracy charge, Ronald's argument here is without merit.

iii.

For these reasons, Ronald Turner's sentence is procedurally reasonable.

b.

Finally, Ronald Turner contends his within-Guidelines sentence is not substantively reasonable due to the lack of a possibility of release and that such a sentence "is rarely imposed." In his view, this sentence was unreasonable given the short duration of his role in the conspiracy (during which he was in prison) and his youth. We cannot agree.

When the district court imposed its sentence, it thoroughly considered the § 3553(a) factors as they applied to Ronald. Begin (and mostly end) with his offense conduct. Ronald led a conspiracy that trafficked at least 4.5 kilograms of pure methamphetamine and used children and violence to do so. That conduct "speaks to the seriousness of defendant's offense conduct and the detrimental impacts of that conduct on the community in terms of the accumulation and distribution of illegal and harmful drugs." The district court acknowledged not only Ronald's difficult upbringing and youth, but also his escalating criminal conduct—including prior convictions for attempted second-degree murder and selling cocaine within 1000 feet of a preschool. For these and other reasons, the district court concluded that the within-Guideline sentence—which itself was a "rare case[]" wherein the exceedingly high base-offense level was

reduced to 43, *see* U.S.S.G. ch. 5, pt. A, cmt. n.2—was appropriate and Ronald has not overcome the presumption of reasonableness we must give to his sentence.

3.

Gilmore was convicted of: (1) conspiracy to distribute various drugs (count one); (2) aiding and abetting the possession of firearms in furtherance of a drug-trafficking crime (count two); (3) conspiracy to commit money laundering (count three); and (4) distribution of more than five grams, but less than 50 grams, of methamphetamine (count 21). The district court calculated Gilmore's offense level at 46, which it then reduced to the maximum level of 43 and combined with his Criminal History Category of III to produce a Guidelines range of life in prison plus a mandatory consecutive five-year sentence for a § 924(c) offense (count two). The court then imposed a life-plus-five-years sentence. Gilmore raises five procedural-reasonableness challenges and asserts that his sentence is substantively unreasonable.

a.

i.

Gilmore was previously convicted of carjacking in Tennessee in violation of Tenn. Code Ann. § 39-13-404. At sentencing in this case, the district court concluded that his Tennessee carjacking conviction was a "serious violent felony," so Gilmore's mandatory-minimum sentence for his drug-trafficking-conspiracy conviction (count one) increased from ten to fifteen years. *See* 18 U.S.C. § 3559(c)(2)(F); 21 U.S.C. § 802(58)(A); *id.* § 841(b)(1)(A). Gilmore contends this conclusion was erroneous because his prior conviction satisfies neither the enumerated-offense clause nor the elements clause of § 3559(c)(2)(F). But we need not consider the merits of his argument because even if he were correct, any such error would be harmless.

"Errors that do not affect the ultimate Guidelines range or sentence imposed are harmless and do not require resentencing." *United States v. Cruz*, 976 F.3d 656, 663 (6th Cir. 2020) (citation omitted). The burden is on the government to demonstrate "to this Court *with certainty* that the error at sentencing did not cause the defendant to receive a more severe sentence." *United States v. Lanesky*, 494 F.3d 558, 561 (6th Cir. 2007) (citation omitted). Although the government did not raise a harmless-error argument here, we may do so sua sponte to "avoid[] futile proceedings in the district court." *United States v. Butts*, 40 F.4th 766, 774 (6th Cir. 2022). That is, if "we are convinced that the error is harmless 'upon review of a clear record,' in other words, when we are certain that any error did not affect the defendant's sentencing outcome, we may conduct a harmless-error analysis on our own accord." *Id.* (internal citations omitted).

Based upon the record, we are convinced that the district court would not have imposed a lower sentence had it not increased Gilmore's mandatory-minimum sentence for his drug-trafficking-conspiracy conviction from 10 to 15 years. That minimum requirement played no role at sentencing (outside of discussing its application, the district court never mentioned it) and still was drastically under the lifelong Guidelines range that was driven almost exclusively by the drug-weight calculation. And as set forth below concerning Gilmore's substantive-reasonableness challenge, the district court gave significant weight to the extensive nature of Gilmore's crimes, so "there is nothing in the record to suggest that [this] enhancement . . . impacted the district court's sentencing decision in any meaningful way." *United States v. Aldridge*, 98 F.4th 787, 799 (6th Cir. 2024). Therefore, even if the district court erroneously raised the statutory mandatory minimum for Gilmore's drug-trafficking-conspiracy conviction by a mere five years, any such error would not warrant remand because it would be harmless. *Butts*, 40 F.4th at 774–75; *see also United States v. Bennett*, 2024 WL 966367, at *7 (6th Cir. Mar. 6, 2024) ("Nothing in the record

indicates that the district court felt constrained by the ten-year mandatory minimum or that it would have imposed a lesser sentence had it found the five-year mandatory minimum appropriate.").

ii.

When a defendant is convicted of a drug-distribution conspiracy, a district court can "hold a defendant accountable for drug quantities with which he was directly involved or that were reasonably foreseeable to him as part of a criminal conspiracy." *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir. 2022) (internal quotation marks omitted). It may do so "based on physical evidence or testimony." *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020). The government has the burden to prove drug quantity by a preponderance of the evidence, *United States v. Castro*, 960 F.3d 857, 868 (6th Cir. 2020), and we review a district court's drug-weight calculation for clear error, *Tisdale*, 980 F.3d at 1096.

Drug weight drove Gilmore's base-offense-level calculation. Crediting testimony by Christopher Hounschell and intercepted phone calls between Alim Turner and Gilmore, the district court attributed to Gilmore at least ten pounds of actual methamphetamine. More specifically, that evidence showed that Hounschell shipped three packages of actual methamphetamine—three pounds, five pounds, and five pounds—to Alim for distribution by the gang. Only the first and third made it to Alim, as law enforcement intercepted the second package. Accordingly, the district court concluded that Gilmore, "based on a very conservative estimate," was "accountable for the five pounds of methamphetamine intercepted by law enforcement and the subsequent five-pound shipment for at least ten pounds of methamphetamine, which equates to 4.5 kilograms of methamphetamine which exceeds the 4.5-kilogram quantity necessary for application of the base-offense level of 38."

Gilmore contends no trial evidence linked him directly to the shipment and receipt of these methamphetamine packages.[5]  But that argument ignores reasonable foreseeability—under conspiracy principles, we attribute drug quantities to a defendant that were "reasonably foreseeable" to him. *See, e.g.*, *id.* at 1097.  Given Gilmore's extensive involvement with assisting Alim as his "right-hand man" and the fact that other Vice Lords distributed large levels of controlled substances (and as reflected in the district court's application of an aggravating-role enhancement discussed next), the district court did not clearly err in assessing Gilmore's drug-quantity responsibility.

iii.

Section 3B1.1(c) of the Guidelines increases a defendant's base-offense level by two "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity."  As outlined above, district courts consider various factors—such as those listed in § 3B1.1 cmt. n.4—to discern leadership status, and we review the relevant factual findings for clear error and ultimate legal conclusion deferentially.

The district court found this enhancement applicable largely given Gilmore's role in helping facilitate the trafficking of drugs after Alim Turner's arrest in July 2019.  At Alim's direction, co-defendant (and cooperating witness) Kiante Cooper was to call either Gilmore or Trey Turner (Alim's 17-year-old brother) for help.  Cooper called Gilmore, who patched in Alim, who then "instructed [Gilmore] to collect various drug debts, to take Trey Turner to obtain money from a safe, and to take the money and meet the methamphetamine source of supply to, 'keep it going.'"  Alim called Gilmore his "right-hand man," and Gilmore's conduct reflects as much—he

---

[5]He also argues it was wrong to attribute the five pounds of methamphetamine intercepted by law enforcement, but "intervention by law enforcement should not alter the amount for which the defendant is held responsible." *United States v. Vasquez*, 352 F.3d 1067, 1074 (6th Cir. 2003).

used Alim's phone to help collect drug debts in order to pay the source of the gang's supply, contacted the source himself, and eventually recruited another person to travel to meet the source.

Gilmore contends that imposing this enhancement was error, asserting his conduct was just "ministerial" and that it was fortuitous that Cooper called Gilmore. Yet, Gilmore still followed through, helping Alim continue the gang's drug-trafficking activities and directing others while doing so. True, Gilmore was not the gang's true leader, but the aggravating-role enhancement broadly applies to anyone who helps lead, in any way, a criminal conspiracy. *See United States v. Taylor*, 85 F.4th 386, 391 (6th Cir. 2023) ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." (quoting U.S.S.G § 3B1.1 cmt. n.4)).

iv.

Section 2D1.1(b)(16)(B) of the Guidelines increases a defendant's base-offense level for drug-trafficking crimes if a defendant received an aggravating-role enhancement under § 3B1.1 and if he "involved" an individual less than 18 years of age in the offense.

The district court found this special-offense-characteristic enhancement applicable to Gilmore based on the gang's involvement of the Turners' 17-year-old brother, Trey, with drug activities. More specifically, Alim directed Gilmore to have Trey "obtain drug proceeds from Alim Turner's safe as well as to provide Trey . . . with a pair of pants containing drug money." In a later phone call with Stewart, Gilmore and Trey confirmed the amount of money in the safe. Based on this evidence, the district court found that Gilmore's conduct qualified for the enhancement for two independent reasons: (1) Gilmore "specifically" involved Trey; and (2) the gang's prevalent use of minors to help traffic drugs was "reasonably foreseeable" to Gilmore. *See,*

*e.g.*, *United States v. Rich*, 14 F.4th 489, 495 (6th Cir. 2021) (discussing the application of co-conspirator conduct to specific-offense enhancements).

Gilmore raises a few issues with this reasoning, none of which are persuasive. First, he contends the involving-a-minor enhancement does not apply because he erroneously received an aggravating-role enhancement. But as set forth above, the appropriateness of the aggravated-role enhancement forecloses that argument. Second, Gilmore argues, "[t]here was no evidence presented that Gilmore knew . . . that Alim's brother was under 18." Yet, Gilmore did not object on that basis to the presentence report in district court. And regardless, the gang's use of minors (and Trey specifically) was well known to gang members—Alim and Ronald Turner had Trey sell marijuana and heroin because it was "safer for him" to sell. Finally, Gilmore contends Trey was already "involved" in the conspiracy, but that does not absolve Gilmore from "involving" Trey in helping to launder the conspiracy's drug money by breaking into Alim's safe.

v.

Section 3C1.1 of the Guidelines increases a defendant's base-offense level by two "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." "Obstructive conduct can vary widely in nature, degree of planning, and seriousness," and it includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. n.3, 4(A). The government must demonstrate that the obstruction-of-justice enhancement applies by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002).

Two of Gilmore's Facebook posts he made during trial formed the basis for this enhancement. He posted the first on July 8, 2021, which was the evening of the second day of trial. On that day, as part of its opening statement, the government "preview[ed] for the jury the names and pictures of cooperating witnesses who would testify in the . . . trial." Gilmore then posted:



As Agent Stryker testified during Gilmore's sentencing hearing, the middle finger emoji is short for "fuck," rats is a "slang term utilized for people who cooperate with the government and law enforcement," and the last emoji is one "of a person spit talking."

He posted the second on December 17, 2021, after his conviction but before sentencing:



Agent Stryker explained this post as well: "So basically what the defendant is stating here on Facebook is that if [cooperating witnesses are] confronted, they're going to say they're real. They're not going to cooperate until their name shows up on paperwork; in this case, it would be discovery for trial. And then after that, they're a rat. And then he says 'FreeMe.' Basically let me out of prison." Some discovery documents in this prosecution made it into the jails for one of

the cooperators (Trevor Cox), so Agent Stryker interpreted Gilmore's post as saying "he's got the paperwork and he's verifying who is cooperating and who is not."

Both posts were "public" and meant to intimidate "anybody willing to cooperate or testify against [Gilmore] or anyone willing to cooperate with law enforcement." Vice Lords members, Stryker testified, view cooperators "[v]ery negatively," and cooperators "usually receive . . . threats of death." In some instances, cooperators have been murdered, assaulted, and subjected to intimidation tactics.

Relying on *United States v. French*, 976 F.3d 744, 749 (6th Cir. 2020), the district court determined Gilmore's posts raised significant "chilling of potential testimony" concerns even though Gilmore did not specifically name any cooperating witnesses. By referring to "rats" just after the first day of trial—before the cooperating co-defendants had testified—and just before his sentencing, the district court concluded, "such statements could reasonably be interpreted as a threat against anyone who cooperated with the government against [Gilmore]." Although we review the district court's legal interpretations de novo and its factual conclusions for clear error, "the proper standard of review for the application of the guideline[s] to the facts is less apparent." *Id.* (citation omitted). But we need not consider what (if any) deference we give to the district court's factual application because even on de novo review, *id.*, Gilmore's challenge is without merit.

On appeal, Gilmore argues his posts were "much ado about nothing" given his youth, the ubiquitous nature of the term "rats" in today's modern culture, and that "[n]o specific person was named, identified, or called out."[6] We disagree. Public posts on Facebook about "rats" before a

---

[6]He also belatedly asserts application of this enhancement constitutes double counting because he received, as part of his aggravating-role enhancement under § 3B1.1, a separate

witness testifies "reasonably [can] be construed as a threat against anyone who would dare cooperate with the Government." *Id.* That Gilmore did not "name names" is unpersuasive, for *French* makes clear that the nature of public posts that are targeted to specific witnesses can still be interpreted broadly by *any* potential cooperator. *See id.* at 749–50.

vi.

For these reasons, Gilmore's sentence is procedurally reasonable.

b.

Finally, Gilmore contends his within-Guidelines, life-plus-five-years sentence is substantively unreasonable.

As with the other defendants, at sentencing, the district court stressed the severity of Gilmore's offense conduct, namely, participating in a conspiracy that trafficked at least 4.5 kilograms of actual methamphetamine and other substances and that used firearms while doing so. To that end, the district court emphasized Gilmore's trafficking of pure methamphetamine and its dramatic impact on society at large: "Methamphetamine, especially the pure form which defendant stands convicted of conspiring to distribute is addictive, deadly, and on the rise." It acknowledged Gilmore's difficult upbringing, mental-health issues, substance-abuse issues, and educational background, but it also noted Gilmore's significant criminal history (including engaging in aggravated robbery and carjacking) and longtime association with Alim Turner and Mahlon Prater. Based on these and other considerations, the district court found a within-Guidelines sentence to be appropriate—he engaged both in serious crimes while on release from his carjacking sentence and in conduct (namely, obstruction of justice) that did not reflect respect

---

enhancement under § 2D1.1(b)(16)(B) for involving a minor (discussed above). But he fails to sufficiently develop this argument or cite any supporting authority, rendering it forfeited. *Hendrickson*, 822 F.3d at 829 n.10.

for the law. So a lengthy sentence, the district court concluded, was required for deterrence and protection of the public. To be sure, the district court acknowledged Gilmore's youth when he engaged in these crimes, but his age, in the district court's eye, did not take "his case outside the heartland of similar cases"—most of Gilmore's co-defendants were of similar age, and "drug distribution by offenders in their 20s is, unfortunately, not a rare occurrence."

On appeal, Gilmore claims the district court viewed his conduct more harshly than that of his co-defendants—Hounschell (a source of the gang's methamphetamine) and Billips (a fentanyl trafficker)—who arguably engaged in worse conduct. This argument is unpersuasive, for § 3553(a)(6) is concerned not with disparities between co-defendants, but "*national* disparities between defendants with similar criminal histories convicted of similar criminal conduct." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008). So too is his "I was a young adult" argument, for the district court appropriately considered Gilmore's relative youth not only with his instant conduct but also in the context of his escalating criminal history. Gilmore has not satisfied his burden of establishing that the sentence imposed here reflects an abuse of discretion.

4.

Stewart was convicted of: (1) conspiracy to distribute various drugs (count one); (2) aiding and abetting the possession of firearms in furtherance of a drug-trafficking crime (count two); (3) conspiracy to commit money laundering (count three); and (4) aiding and abetting the attempted possession with intent to distribute methamphetamine (count four). The district court calculated Stewart's offense level at 45, which it then reduced to the maximum level of 43 and combined with his Criminal History Category of I to produce a Guidelines range of life in prison plus a mandatory consecutive five-year sentence for a § 924(c) offense (count two). The court

then imposed a life-plus-five-years sentence. Stewart raises three procedural-reasonableness challenges to this sentence and asserts that his sentence is substantively unreasonable.

a.

i.

Section 3C1.1 of the Guidelines increases a defendant's base-offense level by two "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." The government must demonstrate that the obstruction-of-justice enhancement applies by a preponderance of the evidence. *Dunham*, 295 F.3d at 609. Here, the district court concluded that Stewart obstructed justice by posting on Facebook—shortly after his trial but before sentencing—the names of seven individuals who testified at trial, along with a rat emoji following each name.

On appeal, Stewart does not contest the district court's finding that the conduct qualified for the enhancement. Instead, he contends there was insufficient proof establishing that *he* posted the message to Facebook because the account that posted the threat was named "Ushery Grissom," and at the time of the post, Stewart was in jail. We review the district court's factual finding that Stewart posted the message for clear error. *See United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019).

At the sentencing hearing, the district court heard testimony from Agent Stryker, who stated that he monitored Stewart's Facebook account before, during, and after trial. At some point after trial, the account's name changed from "Ushery Stewart" to "Ushery Grissom," with Grissom being his mother's maiden name. Stryker also testified about how contraband cell phones

-55-

smuggled into jails allow inmates to access Facebook and that Stewart was overheard on a recorded jail phone call after reviewing the PSR stating, "Me changing my name on Facebook doesn't have anything to do with the case" and "Me saying them people told, that don't mean nothing." In the district court's judgment, that evidence was enough to establish by a preponderance of the evidence that Stewart authored the "rat" post.

Stewart claims this conclusion was erroneous, asserting that "[t]he government offered only speculation and inferences upon inferences," suggesting instead that it was far more plausible that another individual could have logged onto Stewart's account to make the post. Yet, as the government persuasively asserts, this argument ignores Stewart's own words that were captured on a jailhouse recording, wherein he indicated he accessed the account: "*Me* changing my name on Facebook" and "*Me* saying them people." There is no clear error with the district court's factual finding that Stewart made the Facebook post in question.

ii.

Section 3B1.1(b) of the Guidelines increases a defendant's base-offense level by three "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Again, district courts consider various factors—such as those listed in § 3B1.1 cmt. n.4—to discern leadership status, and we review the relevant factual findings for clear error and ultimate legal conclusion deferentially.

The district court concluded "ample evidence in the record . . . show[ed] by a preponderance of the evidence that [Stewart] was a manager or supervisor of the instant offenses," focusing on Stewart's direction of certain co-conspirators and his providing a direct link between the conspiracy's leader (Alim Turner) and its main source of methamphetamine supply (Hounschell). It found that Stewart exerted control over at least three individuals: Gilmore (for

instructing him "to collect $4,800 from another individual" and "to call the source of supply and providing him with certain information"); Hounschell (for acting as an intermediary between him and Alim); and Michael Stewart (for directing him "to drive to the Natchez residence in order to obtain methamphetamine"). Moreover, the district court noted Stewart's extensive relationship with Alim—Stewart "regularly consulted with Alim . . . about obtaining and selling controlled substances, specifically discussing prices and locations for sales." In one instance that showed "some level of decision-making authority within the drug-trafficking conspiracy," Stewart even instructed Alim "to call the source of methamphetamine supply in Nashville and try to negotiate a better price for methamphetamine." In another, Stewart discussed with Alim whether the conspiracy should accept fifteen pounds of methamphetamine to distribute in sufficient time. And after Alim's arrest, Stewart worked with Gilmore "to have money delivered to the Nashville source of supply to obtain more methamphetamine."

On appeal, Stewart paints his involvement as just following directions from the Turner brothers and argues he thus did not control others.[7] But "there can, of course, be more than one person who qualifies as a leader or organizer of a criminal conspiracy. Although [other defendants] all played important roles in the operation, that does not exonerate [Stewart] from a sentencing enhancement premised on [*his*] leadership actions." *United States v. Sadler*, 750 F.3d 585, 594 (6th Cir. 2014) (internal quotation marks and alterations omitted). And, as set forth, the district

---

[7]Stewart confusingly contends that he did not exercise any control over Alim. But the district court made no such finding, and it instead pointed to their working relationship to show Stewart's significant involvement at the leadership level of the conspiracy.

court appropriately captured the power dynamic between Stewart, Gilmore, and Hounschell to apply an aggravating-role enhancement.[8]

iii.

Stewart's last procedural challenge relates to his contention that the district court did not adequately explain why it sentenced Stewart to life in prison instead of 470 months, which is the length of time the Sentencing Commission uses as a statistical proxy for life sentences. *See* U.S. Sent'g Comm'n, 2023 Sourcebook of Federal Sentencing Statistics, App'x A at 175 (2023) ("In cases where the court imposes a sentence of life imprisonment, a numeric value is necessary . . . . Accordingly, life sentences are reported as 470 months, a length consistent with the average life expectancy of individuals sentenced for federal offenses given the average age of those persons."). In his view, the district court's selection of a life sentence instead of 470 months represented a "de facto upward variance" that needed to be explained. Because Stewart failed to object to the district court's explanation below, we review for plain error. *United States v. Hymes*, 19 F.4th 928, 933 (6th Cir. 2021).

A sentence can be procedurally unreasonable when a district court fails to adequately explain the chosen sentence. *See Gall v. United States*, 552 U.S. 38, 50 (2007). Here, the district court sufficiently addressed why it concluded a life and not a 470-month term of imprisonment was appropriate: doing otherwise would "elevate the Commission's statistical data over the text of the Guidelines themselves." *Hymes*, 19 F.4th at 936. That explanation was sufficient to satisfy procedural-reasonableness review under *Gall*. And even if not, the plain-error lens commands

---

[8]Stewart separately objects to the district court's determination that he exercised control over his father, Michael, claiming that he merely helped his father secure methamphetamine for his own personal use. But Stewart did more than that—he directed his father's travel to the gang's stash house on Natchez Street to obtain "a gallon sized bag" of actual methamphetamine.

affirmance—no published caselaw from this circuit requires a district court to distinguish between the Guidelines' life-in-prison recommendations and the Sentencing Commission's use of 470 months as a statistical proxy for life imprisonment. *Cf. Al-Maliki*, 787 F.3d at 794.

iv.

For these reasons, Stewart's sentence is procedurally reasonable.

b.

Stewart asserts his within-Guidelines sentence of life imprisonment (plus a mandatory five-year consecutive sentence for a § 924(c) count) is substantively unreasonable. We disagree.

When the district court imposed Stewart's sentence, it emphasized the extreme seriousness of Stewart's conduct—he helped facilitate the distribution of at least 4.5 kilograms of actual methamphetamine, and he used firearms while doing so. In the district court's words, "this is not an average drug case." It also noted Stewart's prior conviction for carjacking as a 16-year-old, and it expressed concern about the escalation of his behavior, which led to these convictions and his subsequent obstruction of justice. But it also acknowledged Stewart's difficult upbringing, highlighting that his father—and co-conspirator who testified against him—sold drugs during his childhood.

Stewart cannot overcome the presumption of reasonableness we must give to his within-Guidelines sentence. He complains, for example, that the district court did not appropriately consider his relative youth and being led astray by his father at an early age. But given the district court's consideration of these factors in light of Stewart's conduct and the deference owed to the district court to fashion an appropriate sentence, Stewart's sentence is substantively reasonable. *See Rayyan*, 885 F.3d at 442.

5.

Bibbs was convicted of: (1) conspiracy to distribute heroin (count one); (2) being aided and abetted by another person to possess with the intent to distribute heroin (count 12); and (3) being a felon in possession of a firearm (count 15). The district court calculated Bibbs's offense level at 20 and combined it with his Criminal History Category of VI to produce a Guidelines range of 70 to 87 months. The court then varied upward and imposed a 120-month sentence. Bibbs raises three procedural-reasonableness challenges and asserts that his sentence is substantively unreasonable.

a.

i.

Section 2D1.1(b)(12) of the Guidelines enhances a defendant's base-offense level by two if a "defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." This so-called "drug-house enhancement" applies when a defendant "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). Over Bibbs's objection, the district court applied this enhancement after it concluded that Bibbs maintained his residence for the purpose of trafficking heroin. Bibbs challenges this enhancement on appeal, contesting only the third element.

Law enforcement officials discovered 1.2 grams of heroin at Bibbs's house, which he claims reflects only a personal use amount insufficient for application of the enhancement. But the district court, relying on trial testimony that demonstrated by a preponderance of the evidence that 1.2 grams of heroin "would be enough for approximately 12 heroin customers," found that this was "more than a personal use amount." Moreover, law enforcement officers found more than

just heroin at Bibbs's house—they located "several so-called tools of the trade, including a heroin press, Narcan, plastic bags, and Similac, which can be used as a heroin cutting agent." With this evidence, the district court did not err in concluding Bibbs maintained his residence for the purpose of manufacturing or distributing heroin. *See United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014).[9]

ii.

Section 2D1.1(b)(1) of the Guidelines increases a defendant's base-offense level for a drug-related conviction by two "[i]f a dangerous weapon (including a firearm) was possessed." To apply this enhancement, the government must establish, by a preponderance of the evidence, that (1) the defendant actually or constructively possessed the weapon and (2) the possession occurred during the commission of the offense or relevant conduct. *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020). Upon that showing, the burden then shifts to the defendant to "demonstrat[e] that 'it is clearly improbable that the weapon was connected with the offense.'" *Id.* at 188 (quoting U.S.S.G. § 2D1.1 cmt. n.11(A)). Over Bibbs's objection, the district court found a preponderance of the evidence supported application of this enhancement based on law enforcement officials' discovery of a firearm at Bibbs's house, trial testimony that linked Bibbs to carrying a gun to

---

[9]Bibbs additionally argues the district court erroneously relied on acquitted conduct when it applied this enhancement, given that the jury found him not guilty of possessing heroin with the intent to distribute but instead convicted him of the lesser-included offense of simple possession. But acquitted conduct may be used in sentencing so long as the district court finds the relevant facts by a preponderance of the evidence. *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc). And as set forth, the district court made such a finding.

protect his trafficking activities, and "several videos of [Bibbs] possessing a gun during daily activities."

On appeal, Bibbs says this determination was erroneous because the jury acquitted him of the two gun charges he faced—two counts of possessing firearms in furtherance of drug trafficking (counts two and 13). But a jury's acquittal on a § 924(c) gun charge "does not prevent [a] sentencing court from considering conduct underlying the charge of which [a defendant] was acquitted, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Miggins*, 302 F.3d 384, 391 (6th Cir. 2002). Bibbs does not advance any argument concerning the district court's preponderance-of-the-evidence finding regarding application of this enhancement. And regardless, the district court expressly stated that it found the enhancement applicable "not based on acquitted conduct."

## iii.

Section 3B1.2 of the Guidelines reduces a defendant's base-offense level if the defendant "was a minimal participant" (four levels) or a "minor participant" (two levels) "in any criminal activity." A minimal participant in a conspiracy is a defendant "who [is] plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as [a] minimal participant." U.S.S.G. § 3B1.2 cmt. n.4. A "minor participant" is a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5. Because these mitigating-role adjustments are "heavily dependent upon the facts of the particular case," the

Sentencing Commission has provided a list of five non-exhaustive factors for sentencing courts to

consider:

    (i)      the degree to which the defendant understood the scope and structure of the criminal activity;

    (ii)     the degree to which the defendant participated in planning or organizing the criminal activity;

    (iii)    the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

    (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and]

    (v)     the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C). The defendant bears the burden of proving a mitigating role in the

offense by a preponderance of the evidence. *United States v. Guerrero*, 76 F.4th 519, 533 (6th

Cir. 2023). We review a district court's refusal to apply a mitigating-role reduction under § 3B1.2

for clear error. *See Randolph*, 794 F.3d at 616.

The district court concluded that Bibbs was neither a "minor" nor a "minimal" participant

in the heroin-distribution conspiracy. It reasoned (1) that Bibbs "understood the scope and

structure of the heroin distribution portion of the conspiracy," given the connection Bibbs made to

Alim Turner through Billips, (2) that Bibbs's participation was "not substantially less than that of

the average participant" in light of his role being "similar to the roles [of] many other co-

defendants," and (3) that Bibbs "stood to benefit from his participation in the heroin conspiracy by

obtaining profits from the resale of heroin."

Bibbs contends on appeal that he should have received a two-level, minor-participant

reduction, generically asserting he "had no contact with or knew any of the members of the alleged

conspiracy except for Camaron Billips" and that they conducted only one heroin transaction for

seven grams. But this argument ignores the district court's finding that Bibbs trafficked heroin

with Billips in a manner "similar to" the other defendants, and, more importantly, that Bibbs helped facilitate Billips's purchase of heroin from Alim. No clear error occurred here (and for this reason, the district court also did not commit error when it declined Bibbs's request for a downward variance on these same grounds).

iv.

For these reasons, Bibbs's sentence is procedurally reasonable.

b.

Finally, recall that the district court varied upward from Bibbs's Guidelines range of 70 to 87 months and imposed a 120-month sentence. Bibbs contends this variance was erroneous in two conclusory sentences: "Mr. Bibbs submits that the criminal history category of VI does not underrepresent the seriousness of Mr. Bibbs' criminal history or the likelihood that he will commit other crimes. Mr. Bibbs respectfully submits that the upward departure from the guideline range to 120 months is wholly disproportionate, grossly excessive, unreasonable, and is a cruel and unusual sentence in violation of the 8th Amendment to the United States Constitution."

An above-Guidelines sentence is neither presumptively reasonable nor presumptively unreasonable. *United States v. Robinson*, 813 F.3d 251, 264 (6th Cir. 2016). We review such a sentence for abuse of discretion, "whether . . . just outside, or significantly outside the Guidelines range." *United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012) (citation omitted). However, "a major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

In varying upward, the district court expressed its concern with Bibbs's significant criminal history—it reflected escalating violent acts (convictions for aggravated robbery and reckless endangerment), and he committed the crimes for which he was convicted while on supervised

release.  Bibbs also engaged in conduct that was not indicative of respecting authority, including threatening witnesses and law enforcement.  And the district court concluded that "the nature and circumstances of [Bibbs's] offense conduct, coupled with his criminal history and . . . [the] instant crimes demonstrate[] a heightened need for the sentence imposed herein."  This reasoning withstands abuse-of-discretion review.

## V.

For these reasons, we affirm the district court's judgments regarding defendants Alim Turner, Ronald Turner, Kedaris Gilmore, Ushery Stewart, and Demetrius Bibbs.